**Affirmed and Opinion Filed October 5, 2020**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-20-00450-CV
### No. 05-20-00451-CV

## IN THE INTEREST OF M.T., A CHILD
## IN THE INTEREST OF S.R.L., A CHILD

### On Appeal from the 255th Judicial District Court
### Dallas County, Texas
### Trial Court Cause Nos. DF-12-19981-S, DF-17-19782-Z

## MEMORANDUM OPINION
Before Justices Myers, Partida-Kipness, and Reichek
Opinion by Justice Myers

Mother appeals the termination of her parent–child relationships with her children, M.T. and S.R.L. Mother brings eight issues on appeal contending the evidence is legally and factually insufficient to support the statutory grounds for termination, paragraphs (D), (E), (O), and (P) of Family Code section 161.001(b)(1).[1] *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (O), (P). We affirm the trial court's judgments.

---

[1] Mother is not challenging the sufficiency of the evidence to support the jury's finding that termination was in the children's best interest. *See* TEX. FAM. CODE ANN. § 161.001(b)(2).

## BACKGROUND

Mother had two children, M.T. and S.R.L., with different fathers.[2]  In 2017, M.T. was six years old, and S.R.L. was an infant, born in May of that year.

This case began in 2017 when Mother was admitted to the hospital suffering from gallstones not long after giving birth to S.R.L.  Her doctors decided to remove her gall bladder.  Before surgery, the hospital performed a drug test on her, and she tested positive for marijuana and opiates.  Mother admitted to using marijuana but stated she tested positive for opiates because she was receiving painkillers in the hospital.  The hospital notified child protective services ("CPS"). Around the same time, there was a report of neglectful supervision of the children. The children were returned to Mother in November 2017.  However, in December 2017, Mother tested positive for methamphetamine, MDMA (i.e., Ecstasy), and cocaine, and CPS again took possession of the children.

Mother was ordered to complete various services, including individual counseling, parenting classes, and random drug testing.  Mother did not fully comply with the drug-testing requirements, and she failed to show up for several of the drug tests.  In January 2019, Mother tested positive for cocaine.  In May 2019, Mother again used cocaine.  In June 2019, Mother began a 30-day inpatient drug treatment program, but she left after three days.  She then attempted suicide with

---

[2] The rights of both fathers have been terminated.

an overdose of sleeping pills. After the suicide attempt, Mother began another inpatient drug treatment program, which she successfully completed.

After completing the inpatient drug treatment, Mother was admitted into the Legacy Family Court Program, which is a drug-rehabilitation program. That program required regular drug testing, outpatient therapy, and parenting classes. For the drug testing, Mother had to call a telephone number every day to find out if she was required to undergo drug testing that day. If drug testing was required that day, she had to go to the lab for the testing the same day. Of the seventy-three days that Mother was required to call, testing was required on thirty-three of them. Mother appeared for the testing on eight of those days. She passed each time, but she missed twenty-five of the tests either because she did not call to find out if testing was required or because she called but then did not appear for testing. Mother completed the parenting classes, but she did not complete the outpatient therapy. Mother was discharged from the program before successfully completing it because she failed to comply with the program's requirements.

After being discharged from the Legacy Family Court Program, Mother moved to West Virginia where her mother and brother lived. She stated that after her pregnancy (which required months of bedrest), the gall-bladder surgery, and her inpatient drug treatment, she was in severe financial straits. When she came out of the hospital following her pregnancy and surgery, she had lost her job and an eviction notice was on her door. She was able to rent a house, but when she

came out of the inpatient drug treatment, the water at the house had been turned off. She said she was so far behind on her bills that she had no way to catch up, so she moved back to West Virginia.

After moving to West Virginia, Mother did not undergo any additional drug treatment or drug testing. She asked CPS in Dallas to allow her to complete her services in West Virginia, but CPS denied her request. Mother's caseworker testified that CPS does not have access to services in West Virginia. Mother testified she regularly attends AA/NA meetings in West Virginia and that she speaks frequently with her sponsor. She said she has not used drugs since she used cocaine in May 2019.

Meanwhile, CPS placed S.R.L. into a foster home in Fairfield, Texas. M.T. had behavioral problems stemming from ADHD and "a lot of anger," and she was placed unsuccessfully with several different foster families. CPS then placed M.T. in a residential treatment center in Houston. That center provided M.T. structure and therapy that have helped her. CPS's plan for the children is for both of them to be adopted by the foster family in Fairfield.

Mother had visitation with the children once every two weeks. For the visitation sessions after M.T. was admitted to the treatment center in Houston, M.T. had to fly from Houston to Dallas, which was physically traumatic for her. According to CPS's witnesses, Mother missed many of the visitation sessions (at

–4–

least twenty-five) without notifying CPS that she would not be there. Her failure to show up for visitation with the children was highly upsetting to M.T.[3]

CPS also set up two family-therapy sessions for Mother and M.T. with a licensed therapist. Because Mother was in West Virginia, it was arranged for her to participate remotely; however, Mother did not call in to the sessions. the court appointed special advocate assigned to the case testified that "[M.T.] had a really hard time expecting her mom to be on a call, and then she wasn't there." The clinical supervisor at the residential treatment facility testified that when Mother missed the visitation and therapy sessions with M.T., the child had an increase in anxiety and mood dysregulation, including "a lot more crying spells, a lot more irritability[,] . . . and a few episodes where she just didn't want to get out of bed and go to school that day following."

S.R.L. was less affected by Mother's absences than M.T. S.R.L. was an infant when this case started. She calls the foster mother "mom" or "mommy." When Mother missed the visits, M.T. would start crying, and S.R.L. would sometimes cry with her or hug her and try to comfort her.

**STANDARD OF REVIEW**

The Family Code provides that a court may order termination of a parent–child relationship if the court finds by clear and convincing evidence that the

---

[3] Mother testified that some of the visitations with M.T. were in Houston and that she drove from West Virginia to Houston to see M.T. and then drove to Dallas for visitation with S.R.L.

parent engaged in prohibited by section 161.001(b)(1) and that termination is in the child's best interest. *See* FAM. § 161.001(b)(1), (2).

Because the fundamental liberty interest of parents in the care, custody, and control of their children is of constitutional dimensions, involuntary parental terminations must be strictly scrutinized. *Troxel v. Granville*, 530 U.S. 57, 65–66 (2000); *In re K.M.L.*, 443 S.W.3d 101, 112 (Tex. 2014). In such cases, due process requires the petitioner to justify termination by clear and convincing evidence. FAM. § 161.001(b); *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012). "Clear and convincing evidence" is that "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." FAM. § 101.007; *In re N.G.*, 577 S.W.3d 230, 235 (Tex. 2019) (per curiam); *In re N.T.*, 474 S.W.3d 465, 475 (Tex. App.—Dallas 2015, no pet.).

On appeal, we apply a standard of review that reflects the elevated burden at trial. *In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2014); *In re A.T.*, 406 S.W.3d 365, 370 (Tex. App.—Dallas 2013, pet. denied). Under both legal and factual sufficiency standards, we consider all the evidence, defer to the factfinder's credibility determinations, and determine whether the factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven. *In re J.F.C.*, 96 S.W.3d 256, 265–66 (Tex. 2002); *In re N.T.*, 474 S.W.3d at 475. "The distinction between legal and factual sufficiency lies in the extent to which

disputed evidence contrary to a finding may be considered." *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018).

In conducting a legal sufficiency review of an order terminating parental rights, the reviewing court cannot ignore undisputed evidence contrary to the finding but must otherwise assume the factfinder resolved disputed facts in favor of the finding. *Id.* We "consider all the evidence, not just that which favors the verdict," and we assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. *In re N.T.*, 474 S.W.3d at 475. We disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *Id.*

When reviewing the factual sufficiency of the evidence supporting a termination finding, we ask whether, in light of the entire record, the evidence is such that a factfinder could reasonably form a firm conviction about the truth of the allegations against the parent. *Id.*; *In re J.D.B.*, 435 S.W.3d 452, 463 (Tex. App.—Dallas 2014, no pet.). We must consider whether the disputed evidence is such that a reasonable factfinder could not have reconciled that disputed evidence in favor of its finding. *In re N.T.*, 474 S.W.3d at 475. If the disputed evidence is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *Id.*

In this case, the jury found Mother engaged in conduct prohibited by paragraphs (D), (E), (O), and (P) of section 161.001(b)(1), and that termination

was in the best interest of the children.  *See* FAM. § 161.001(b)(1)(D), (E), (O), (P); *id.* § 161.001(b)(2).  When, as in this case, a trial court terminates a parent's rights based on section 161.001(b)(1)(D) or (E) and the parent challenges that finding on appeal, due process requires the appellate court to review the finding and detail its analysis even if it affirms the termination order based on other grounds under section 161.001(b)(1).  *In re C.W.*, 586 S.W.3d 405, 406 (Tex. 2019) (per curiam); *In re N.G.*, 577 S.W.3d at 235.

## ENDANGERING THE CHILDREN

In the first four issues, Mother contends the evidence is legally and factually insufficient to support the jury's findings that Mother engaged in conduct prohibited by paragraphs (D) and (E) of section 161.001(b)(1).  Those paragraphs authorize termination when it is in a child's best interest and the parent:

> (D) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child;

> (E) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child . . . .

FAM. § 161.001(b)(1)(D), (E).

Both subsections (D) and (E) require proof of endangerment.  *See id.* "Endanger" means to expose to loss or injury, or to jeopardize a child's emotional or physical health.  *In re J.D.B.*, 435 S.W.3d at 463.  "'[E]ndanger' means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal

–8–

family environment, [but] it is not necessary that the conduct be directed at the child or that the child actually suffers injury." *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). The primary distinction between paragraphs (D) and (E) is the source of the physical or emotional endangerment to the child. *In re J.D.B.*, 435 S.W.3d at 463. Paragraph (D) addresses the child's surroundings and environment while paragraph (E) addresses parental misconduct. *Id.* *Compare* FAM. § 161.001(b)(1)(D), *with id.* § 161.001(b)(1)(E). Parental conduct, however, is relevant to the child's environment under paragraph (D). A parent's drug use, violence, or other abuse may make the child's environment endangering to the child. *In re J.D.B.*, 435 S.W.3d at 464.

## Section 161.001(b)(1)(D)

In Mother's first and third issues, Mother contends the evidence was legally and factually insufficient to support the jury's findings under paragraph (D). For this paragraph, the jury found by clear and convincing evidence that Mother "knowingly placed or knowingly allowed the child to remain in conditions and surroundings which endanger the physical or emotional well-being of the child." A parent acts "knowingly" when the parent is aware that the environment creates a potential danger to the child, but the parent disregards that risk. *See In re P.N.T.*, 580 S.W.3d 331, 355 (Tex. App.—Houston [14th Dist.] 2019, pet. denied); *In re L.M.M.*, 522 S.W.3d 34, 44 (Tex. App.—Houston [1st Dist.] 2017, pet. denied).

Mother was married to R.L., who was S.R.L.'s father, and Mother left the children in his care when she had medical problems. R.L. had been convicted of aggravated assault with a deadly weapon, twice convicted of evading arrest, and also convicted of possession of one or more but less than four grams of a controlled substance. R.L. was serving a six-year sentence for the last conviction at the time of trial. There was also evidence that R.L. was a member of the "Crips 42" gang and that he sold drugs. Mother testified that she was aware of R.L.'s criminal background, but she denied that he was a drug dealer. She testified that his conviction for possession of a controlled substance happened after they had separated in October 2019. R.L.'s parent–child relationship with S.R.L. was terminated for endangerment under paragraphs (D) and (E) as well as under paragraphs (N) (constructive abandonment) and (Q) (conviction of offense resulting in inability to care for child for two years).

Besides R.L.'s convictions, there was evidence of at least one incident of violence toward Mother that endangered the children. Shortly after S.R.L. was born, Mother and R.L. had an argument. R.L. tried to leave the room, but Mother attempted to stop him. As Mother described the incident, "He moved me away from the door, but with a force that made me fall down. When I fell, I fell on top of her [S.R.L.'s] car seat." Mother testified that S.R.L. "showed no signs of anything being wrong," but Mother took her to the hospital to be examined because "she was so young at the time that I wanted to make sure that it did not

–10–

affect her in any way." Although it is not clear from the testimony why Mother thought S.R.L. might have required medical attention, she testified that she understood S.R.L. "could have been hurt, seriously hurt."

The evidence shows R.L. had a criminally violent background and that he had committed domestic violence against Mother in a manner that endangered at least S.R.L. The jury could infer from the evidence that R.L. had a propensity for violence and lacked self-control. Although Mother was aware of R.L.'s violent background, she permitted him to be around the children and even left them in his care when she was sick. Also, although Mother knew R.L.'s parental rights to S.R.L. had been terminated, she indicated she intended to allow R.L. to be around the children after his release from prison. Mother denied "communicating" with R.L., but she admitted she posted messages to him on Facebook, including the following about two months before trial:

> I wouldn't even come close to being the woman I am today if you hadn't c[o]me into my life. I owe you everything!! I'm going to spend the rest of my life making sure you achieve everything you['re] meant to and obtain everything you deserve by any means necessary.

Mother testified that she does not think R.L. "has ever endangered either one of our children" or that he is unsafe to be around the children.[4] She testified that she

---

[4] Although it is not completely clear what Mother meant in the testimony quoted below, it appears she testified that if the State's allegations about R.L. were true, then he would be a danger to the children:

"hope[s] that the father of my children will come home and do what is necessary for him to be a role model in his children's life." She testified that she knew R.L.'s parental rights had been terminated, and she stated that if the children were returned to her, the children would not be exposed to him until the court gave permission. But she testified that situation "can be changed if a said person does the steps to prove that they are not a harm to their child." The jurors could determine from this evidence that Mother did not believe R.L. was a danger to the children, and they could disbelieve her statements that R.L. would not have access to the children following his release from prison.

After considering all the evidence, we conclude the evidence was sufficient for a reasonable juror to form a firm belief or conviction that Mother "knowingly

---

Q. . . . [T]he court has already terminated his [R.L.'s] rights for, if we can recall, knowingly putting these children in danger, do you agree with that that the court found that to be the case for [R.L.]?

A. I'm not—I'm not understanding what—you have made a very good case as to mistakes that [R.L] has made, but you have not shown me any circumstance where he put the children in any harm's way or in any danger, ever.

Q. So from that then because you feel like I didn't put a good case to show—

A. No, you didn't make any case.

Q. So then you don't think that, again, the children would be unsafe around [R.L.] is that right?

A. I think that if the things that you put on here—

Q. Is that a yes or a no?

A. —continue to be—

[Assistant District Attorney]: Objection, nonresponsive.

A. —then, yes, he would be a danger to the children. But if—

The Court: Ma'am—sustained.

–12–

placed or knowingly allowed the child[ren] to remain in conditions and surroundings which endanger the physical or emotional well-being of the child[ren]." FAM. § 161.001(b)(1)(D). None of the disputed evidence in this case was so significant that a reasonable juror could not have formed a firm belief or conviction that Mother "knowingly placed or knowingly allowed the child[ren] to remain in conditions and surroundings which endanger the physical or emotional well-being of the child[ren]." Therefore, the evidence was legally and factually sufficient to support the jury's findings under paragraph (D). We overrule Mother's first and third issues.

### Section 161.001(b)(1)(E)

In her second and fourth issues, Mother contends the evidence is legally and factually insufficient to support the jury's findings under paragraph (E). For this paragraph, the jury found by clear and convincing evidence that Mother "has engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child."

A "parent's decision to engage in illegal drug use during the pendency of a termination suit, when the parent is at risk of losing a child, may support a finding that the parent engaged in conduct that endangered the child's physical or emotional well-being." *In re A.M.*, 495 S.W.3d 573, 580 (Tex. App.—Houston [1st Dist.] 2016, pet. denied) (quoting *In re K.C.F.*, No. 01-13-01078-CV, 2014 WL 2538624, at *9–10 (Tex. App.—Houston [1st Dist.] June 5, 2014, no pet.)

–13–

(mem. op.)). This is because a parent's drug use is indicative of instability in the home as it exposes the child to the possibility that the parent may be impaired or imprisoned. *See In re A.M.*, 495 S.W.3d at 579. "As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child." *In re E.V.V.M.-H.*, No. 01-18-00888-CV, 2019 WL 1388029, at *5 (Tex. App.—Houston [1st Dist.] Mar. 28, 2019, no pet.) (mem. op.) (quoting *N.A.B. v. Tex. Dep't of Family & Protective Servs.*, No. 03-14-00377-CV, 2014 WL 6845179, at *2 (Tex. App.—Austin Nov. 26, 2014, no pet.) (mem. op.)).

Mother admitted using drugs both before and after CPS took custody of the children. She tested positive for marijuana, cocaine, methamphetamine, and MDMA during the case. She also failed to comply with the drug-testing requirements imposed by CPS and the Legacy Family Court Program. Although Mother testified she was not using drugs after May 2019, the jury could reasonably infer Mother avoided taking the drug tests because she was using drugs. *See In re C.R.*, 263 S.W.3d 368, 374 (Tex. App.—Dallas 2008, no pet.).

Mother's continued drug use during the pendency of this case endangered the children's well-being by prolonging and exacerbating the children's instability. Witnesses testified that M.T. was strongly bonded to Mother, and the separation from Mother was traumatic for her: "She's just a kid that was really, really struggling with how to deal with the anger, and the hurt, and the confusion of what

–14–

happened to her." The jury could have reasonably concluded that the children's separation from Mother, M.T.'s trauma, and S.R.L.'s separation from Mother for almost her entire life were the result of Mother's drug use.

Additionally, although Mother attended many of the visitation sessions, she missed some of them without notifying CPS that she would not be there. These absences occurred after she had confirmed with CPS a few days before the visits that she would be there. Mother provided various excuses to CPS for missing the visitation sessions, including that she was sick, that she had locked her keys in her car, that she was in an auto accident while on the way to visitation, and that she passed out in an Uber while on the way to visitation and had to be taken to the hospital. Mother also testified that CPS's visitation logs showed she missed only two out of fifteen visitation sessions. However, witnesses for CPS testified Mother missed at least twenty-five visitation sessions. Mother also testified that after she moved to West Virginia, she had to drive to Houston and Dallas for visitation and that the sessions were canceled if she was more than fifteen minutes late.

Mother's failure to show up for visitation upset the children, particularly M.T. Both children had to travel long distances for the visitation with Mother. S.R.L. had to travel by car one-and-a-half to two hours each way from Fairfield, and M.T. had to fly from Houston. The CPS caseworker testified about how Mother's failure to appear for the visitation sessions upset the children. "[M.T.] cries. She screams. She lashes out. She tries to—sometimes tries to—she tries to

–15–

express it, but she doesn't know how . . . . She doesn't know how to say, I'm mad or I'm hurt, until recently." The clinical supervisor at M.T.'s residential treatment facility testified that when Mother missed the visitation and therapy sessions, M.T. had an increase in anxiety and mood dysregulation, including "a lot more crying spells, a lot more irritability[,] . . . and a few episodes where she just didn't want to get out of bed and go to school that day following." S.R.L. was less affected by Mother's absences than M.T. However, when M.T. would start crying, S.R.L. would sometimes cry, or she would hug M.T. and try to comfort her. Mother testified that she could imagine her missing the visits was "extremely detrimental" to M.T.

Mother points to evidence that when she attended the visitations, she provided food, activities, pictures, and videos, and the children enjoyed their time with her. She also points to testimony that she was a good parent to the children when they were in her custody. The children always had clean clothes and enough food and toys.

Besides endangering the children through her drug use, Mother also attempted suicide. Threats or attempts to commit suicide may also contribute to a finding that the parent engaged in a course of conduct that is detrimental to a child's physical or emotional well-being. *See In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied).

Mother also had other criminal offenses that added to the children's instability. *See In re A.D.*, No. 10-19-00411-CV, 2020 WL 4691657, at *5 (Tex. App.—Waco Aug. 10, 2020, pet. filed) (mem. op.) (parent's engaging in criminal conduct endangers child's emotional well-being). Before the children's removal, Mother was charged with unlawfully carrying a weapon in Dallas County. Several days after removal, Mother committed the offenses of unlawfully carrying a weapon and prostitution in Grayson County. About a year later, Mother was arrested for unlawfully carrying a weapon in New Orleans, Louisiana.

Considering all the evidence before the jury, including Mother's drug use, attempted suicide, criminal conduct, and her failure to appear for visitation and therapy sessions with the children and the effect of the missed visits on the children, and deferring to the jury's credibility determinations, we conclude a juror could reasonably form a firm belief or conviction that Mother engaged in conduct that endangered the physical or emotional well-being of M.T. and S.R.L. None of the disputed evidence in this case was so significant that a reasonable juror could not have formed a firm belief or conviction that Mother engaged in conduct that endangered the children's physical or emotional well-being. Accordingly, the evidence is legally and factually sufficient to support the jury's finding concerning paragraph (E) of section 161.001(b)(1).

We overrule Mother's second and fourth issues. Having found the evidence is legally and factually sufficient to support the jury's findings under paragraphs

–17–

(D) and (E), we need not address Mother's remaining issues, which challenged the sufficiency of the evidence to support the jury's findings under paragraphs (O) and (P).

## CONCLUSION

We affirm the trial court's judgments.


/Lana Myers/
LANA MYERS
JUSTICE


Partida-Kipness, J., concurring and dissenting

200450F.P05



## Court of Appeals
## Fifth District of Texas at Dallas

### JUDGMENT

IN THE INTEREST OF M.T., A CHILD

No. 05-20-00450-CV

On Appeal from the 255th Judicial District Court, Dallas County, Texas
Trial Court Cause No. DF-12-19981-S.
Opinion delivered by Justice Myers. Justices Partida-Kipness and Reichek participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 5th day of October, 2020.



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

IN THE INTEREST OF S.R.L., A CHILD

No. 05-20-00451-CV

On Appeal from the 256th Judicial District Court, Dallas County, Texas
Trial Court Cause No. DF-17-19782-Z.
Opinion delivered by Justice Myers. Justices Partida-Kipness and Reichek participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 5th day of October, 2020.